# United States Court of Appeals for the Eighth Circuit

SAMANTHA STINSON, *et al.*,
*Plaintiffs-Appellees,*

JULEE JAEGER, *et al.*,
*Plaintiffs-Appellees,*

CHRISTINE BENSON, *et al.*,
*Plaintiffs-Appellees,*

v.

FAYETTEVILLE SCHOOL DISTRICT NO. 1, *et al.*,
*Defendants,*

CONWAY SCHOOL DISTRICT, NO. 1,
*Defendant,*

LAKESIDE SCHOOL DISTRICT, NO. 9,
*Defendant,*

STATE OF ARKANSAS,
*Intervenor-Appellant.*

On Appeal from the United States District Court for the
Western District of Arkansas, No. 5:25-cv-05127-TLB
Hon. Timothy L. Brooks

## BRIEF OF AMICI CURIAE ARKANSAS STATE SENATOR JIM DOTSON AND STATE REPRESENTATIVE ALYSSA BROWN IN SUPPORT OF APPELLANT

*Counsel for Amici Curiae on inside cover*

KELLY J. SHACKELFORD
JEFFERY C. MATEER
DAVID J. HACKER
JEREMIAH G. DYS*

FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, TX 75075
Tel.: (972) 941-4444
jdys@firstliberty.org

*Counsel for Amici Curiae*

January 13, 2026                    * Counsel of Record

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 3

ARGUMENT .................................................................................. 5

I. *Kennedy* Instructs Courts to Examine Historical Practices and Understandings in Establishment Clause Cases. ........................... 5

II. Religious Themes and Traditions Have Always Infused Our Nation's Culture. .................................................................... 8

    A. Evidence abounds of Founding-era emphasis on religious themes and traditions, and that emphasis persists today. ........................................................ 9

    B. Other religious themes and traditions remain ubiquitous. ..................................................... 11

    C. Representations of the Ten Commandments, in particular, are longstanding and ubiquitous. ....................... 14

        1. Ten Commandments in the Public Square ................. 14

        2. The Ten Commandments in Schools ......................... 16

III. In Light of the Long History of Religious Displays, Including the Ten Commandments, Act 573 Does Not Violate the Establishment Clause. .............................................................. 22

CONCLUSION .............................................................................. 25

CERTIFICATE OF COMPLIANCE ................................................. 26

Appellate Case: 25-3311    Page: 3    Date Filed: 01/26/2026 Entry ID: 5600759

CIRCUIT RULE 28A(h) CERTIFICATION ...........................................26

CERTIFICATE OF SERVICE ...............................................................27

ii

# TABLE OF AUTHORITIES

## Cases

*ACLU Nebraska Foundation v. City of Plattsmouth*,
419 F.3d 772 (8th Cir. 2005) ................................................................23

*American Legion v. American Humanist Ass'n*,
588 U.S. 29 (2019) ..................................................3, 4, 21, 23

*Fitz v. Dolyak*,
712 F.2d 330 (8th Cir. 1983) ............................................. 2

*Groff v. DeJoy*,
600 U.S. 447 (2023) ................................................... 5

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022) ..............................................passim

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) ................................................... 2

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ..............................................2, 8, 9, 23

*Marsh v. Chambers*,
463 U.S. 783 (1983) ................................................11

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ..............................................4, 7, 8, 24

*Stinson et al v. Fayetteville School District No. 1 et al.*,
No. 5:25-cv-05127 (W.D. Ark. Aug 4, 2025) ......................... 5

*Stone v. Graham*,
449 U.S. 39 (1980) ..................................................4, 5

*Town of Greece v. Galloway*,
572 U.S. 565 (2014) ..............................................passim

*Van Orden v. Perry*,
545 U.S. 677 (2005) ..............................................passim

Appellate Case: 25-3311    Page: 5    Date Filed: 01/26/2026 Entry ID: 5600759

## Statutes

4 U.S.C. § 4 ..................................................................13

31 U.S.C. § 5112 ...........................................................13

31 U.S.C. § 5114 ...........................................................13

36 U.S.C. § 302 .............................................................13

## Other Authorities

Ala. Code § 1-2-5 (2024) ................................................12

Brief for the United States as Amicus Curiae,
    *Van Orden*, 2005 WL 263790.....................................15

Charles Heartman, *The New England Primer Printed in America Prior
    to 1830: A Bibliographical Checklist* (1915) .......................18

Clare Mulroy, State mottos across America: Full list of the slogans for
    all 50 states and DC, USATODAY (Mar. 5, 2023),
    https://www.usatoday.com/story/news/2023/03/05/official-state-mottos-
    list-united-states/11068473002/ ...................................12

Daniel L. Driesbach & Mark David Hall, *The Sacred Rights of
    Conscience* ..............................................................19

Encyclopedia Brittanica, *The New-England Primer* ...........................18

Fla. Dep't of State, State Flag, https://dos.fl.gov/florida-facts/florida-
    state-symbols/state-flag/ (last visited Dec. 23, 2025) ...........12

H.R. Con. Res. 31, 105th Cong. (1998) ...............................14

James W. Fraser, *Between Church and State* (2d ed. 2016)..................16

Jenna Weismann Joselit, *Set in Stone: America's Embrace of the
    Ten Commandments* (2017) ....................................16

Letter from Chief Justice William H. Taft to Henry Ford
    re: McGuffey's Readers (Oct. 31, 1924)...........................17

Appellate Case: 25-3311    Page: 6    Date Filed: 01/26/2026 Entry ID: 5600759

*McGuffey's Fourth Eclectic Reader* (1920 rev. ed.) .................................17

Md. Sec'y of State, Maryland Flag Protocol - Description and Care,
https://sos.maryland.gov/pages/maryland-flag-protocol-description-
and-care.aspx (last visited Dec. 23, 2025) ...........................................12

Miss. Code Ann. § 3-3-16(1) (2025) .........................................................12

N.M. Sec'y of State, About New Mexico, State Flag,
https://www.sos.nm.gov/about-new-mexico/state-flag/
(last visited Dec. 23, 2025) ....................................................................12

Nathan S. Chapman, *Forgotten Federal-Missionary Partnerships:*
*New Light on the Establishment Clause*,
96 NOTRE DAME L. REV. 677 (2020).......................................................20

Noah Webster, *The American Spelling Book*
(Cushing & Jewett, 1825) .......................................................................19

Office of the Curator, *Courtroom Friezes: South and North Walls*,
Supreme Court of the United
States, https://www.supremecourt.gov/about/northandsouthwalls.pdf
(last updated May 8, 2003) .....................................................................15

Office of the Curator, *The East Pediment*, Supreme Court of the United
States, https://www.supremecourt.gov/about/EastPediment10-12-
2021_Final.pdf (last updated Oct. 12, 2021)........................................15

R. Freeman Butts & Lawrence A. Cremin,
*A History of Education in American Culture* (1953) ............................18

Rein Fertel, *Louisiana State Flag*, 64 Parishes (Mar. 23, 2024),
https://64parishes.org/entry/louisiana-state-flag ................................12

Second Continental Congress, Nov. 1,
1777 Thanksgiving Proclamation ........................................................... 9

Steven K. Green, *The Second Disestablishment:*
*Church and State in Nineteenth-Century America* (2010)...................20

*The New England Primer* (1777) ............................................................19

Appellate Case: 25-3311     Page: 7     Date Filed: 01/26/2026 Entry ID: 5600759

Val Brinkerhoff, *The Symbolism of the Beehive in Latter-day Saint Tradition*, https://byustudies.byu.edu/article/the-symbolism-of-the-beehive-in-latter-day-saint-tradition (last visited Dec. 23, 2025) .......12

Appellate Case: 25-3311    Page: 8    Date Filed: 01/26/2026 Entry ID: 5600759

# IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are Members of the Arkansas Legislature, Senator Jim Dotson and Representative Alyssa Brown. Sen. Dotson represents Arkansas Senate District 34, which includes a portion of Bentonville. Rep. Brown is the elected representative for House District 41, which includes portions of Cleburne and Stone Counties. Together, Sen. Dotson and Rep. Brown were the primary sponsors in the Arkansas Senate and House, respectively, for Act 573—at issue in the instant case.

As elected Arkansas legislators that drafted and passed the law at issue in this case, *Amici* have a crucial interest in ensuring that the Court applies the correct understanding of the Establishment and Free Exercise clauses to Arkansas's Ten Commandments law. *Amici*—and their electing constituencies—rightly understand that Act 573 is well-

---

[1] Counsel for *Amici Curiae* authored this brief in its entirety. No party's counsel authored this brief, in whole or in part. No party or party's counsel contributed any money that was intended to fund the preparation or submission of this brief. No person—other than *Amici Curiae*, their members, or their counsel—contributed money that was intended to fund the preparation or submission of this brief.

*Amici Curiae* file this document as a proposed brief accompanying a motion for leave to file under Rule 29(a)(3) of the Federal Rules of Appellate Procedure.

1

within the bounds of both the Free Exercise and Establishment Clauses. Wishing to continue the "unbroken history of official acknowledgement by all three branches of government of the role of religion in American life," *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984), *Amici* sponsored this bill through the Arkansas legislative process.

Both the Arkansas Senate and House of Representatives passed Act 573 which Arkansas Governor Sarah Huckabee Sanders then signed into law. "Since a presumption of constitutionality attaches to state legislative enactments," *Fitz v. Dolyak*, 712 F.2d 330, 333 (8th Cir. 1983), this Court should give great scrutiny to the district court's decision below. With the long overdue overruling of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), Arkansas is legally able to recognize the Ten Commandments' role in our Nation's history and legal systems.

Arkansas—in passing Act 573—has chosen to acknowledge the Ten Commandments as a fundamental foundation of both U.S. and Arkansas law through requiring the posting of the Ten Commandments in all taxpayer-funded buildings, including public schools. This acknowledgment is consistent with our Nation's history and tradition of

2

recognizing Moses as a lawgiver and the Ten Commandments as a historical foundation of our laws. *See American Legion v. American Humanist Ass'n*, 588 U.S. 29, 53 (2019). "[A]cknowledgements," like the one in Act 573, "of the role played by the Ten Commandments in our Nation's heritage are common throughout America." *Van Orden v. Perry*, 545 U.S. 677, 688 (2005) (plurality op.). These displays are even on display to every visitor to Washington, D.C., including schoolchildren on field trips.

Because the decision below incorrectly holds that Act 573 likely violates the Establishment and Free Exercise clauses, *Amici* urges this Court to reverse.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For more than two centuries, the Supreme Court has recognized that references to the divine and displays of religious symbols have coexisted harmoniously with the principles of the First Amendment. The Ten Commandments, in particular, occupy a singular place in America's civic and moral tradition. From their depiction in the Supreme Court's own marble friezes to their appearance in early school textbooks, these principles have long been acknowledged as part of the Nation's legal and

3

cultural foundation. Arkansas's Act 573—which simply mandates the passive display of the Ten Commandments in classrooms—falls squarely within that enduring historical practice. Contrary to the district court's conclusion, the Act neither coerces religious observance nor establishes a state church; it reflects the same permissible acknowledgment of the divine that has always been part of our constitutional heritage.

The district court erred by treating *Stone v. Graham*, 449 U.S. 39 (1980), as controlling, even though its rationale rested on *Lemon*—a framework the Supreme Court has now expressly abandoned. *See Kennedy*, 597 U.S. at 535. Under *Kennedy*'s test, which is rooted in "historical practices and understandings," Act 573 easily withstands constitutional scrutiny. *Id.* (quoting *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576 (2014)). The law bears none of the hallmarks of religious establishment identified in *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring), and instead mirrors long-accepted governmental acknowledgments of religion, such as legislative prayer, national mottos, and public monuments upheld in cases like *Van Orden v. Perry*, 545 U.S. 677 (2005), and *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29 (2019). The Court should therefore reverse and

4

reaffirm that such displays comport with the original understanding of the Establishment Clause.

## ARGUMENT

**I.** ***Kennedy* Instructs Courts to Examine Historical Practices and Understandings in Establishment Clause Cases.**

In holding that Act 573 violates the Establishment Clause, the district court placed significant weight on *Stone v. Graham*, 449 U.S. 39 (1980). *See Stinson et al v. Fayetteville School District No. 1 et al.*, No. 5:25-cv-05127, slip op. at 25 (W.D. Ark. Aug 4, 2025) ("This case begins and ends with Stone."). In *Stone*, the Supreme Court struck down Kentucky's law mandating displays of the Ten Commandments in public school classrooms. 449 U.S. at 42–43. But *Lemon*, the bedrock of the *Stone* decision, was "long ago abandoned," *Kennedy,* 597 U.S. at 534, and has now been abrogated, *see Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023); *see also Kennedy*, 597 U.S. at 546 (Sotomayor, J., dissenting) ("The Court overrules *Lemon* . . ., and calls into question decades of subsequent precedents that it deems 'offshoot[s]' of that decision.").

For good reason: *Lemon*'s "examination of a law's purposes, effects ... potential for entanglement with religion ... [and] estimations about whether a 'reasonable observer' would consider the government's

5

challenged action an 'endorsement' of religion" "'invited' chaos in the lower courts, led to 'differing results' in materially identical cases, and created a 'minefield' for legislators." *Kennedy*, 597 U.S. at 534 (quoting *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 768–69 (1995)). Accordingly, the test set out in *Lemon* no longer controls Establishment Clause analyses and to continue to apply *Lemon* or any case that relied on *Lemon* is a violation of Supreme Court precedent. *Id.* at 535.

In its place, the Supreme Court instructed courts in Establishment Clause cases to look to "historical practices and understandings" and draw lines "'between the permissible and impermissible'" that "'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" *Id.* at 535–36 (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576–77 (2014) (alterations in original)). The Court accordingly shifted the focus of Establishment Clause evaluations away from purpose, effects, and endorsements, and towards the "hallmark[] of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537. In so doing, the Court

6

intended to give guidance "localities and lower courts can rely on." *Shurtleff*, <u>596 U.S. at 285</u> (Gorsuch, J., concurring).

In the same vein, *Kennedy* approvingly cited a description of six particular historical hallmarks of religious establishment. *Kennedy*, <u>597 U.S. at 537</u> n.5 (citing *Shurtleff*, <u>596 U.S. at 286</u> (Gorsuch, J., concurring)). They are:

(1) "the government exerted control over the doctrine and personnel of the established church";

(2) "the government mandated attendance in the established church and punished people for failing to participate";

(3) "the government punished dissenting churches and individuals for their religious exercise";

(4) "the government restricted political participation by dissenters";

(5) "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches"; and

(6) "the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function."

*Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring).

As discussed in Sections II and III, Arkansas' law comports with Founding-era historical practices and understandings, as required by *Kennedy*, and lacks any of the historical hallmarks of coercion described in *Shurtleff*. These frameworks have replaced *Lemon* and its progeny, and render *Stone* a dead letter.

## II. Religious Themes and Traditions Have Always Infused Our Nation's Culture.

The display of the Ten Commandments in school classrooms does not implicate any of the hallmarks of religious establishment identified in *Kennedy*. From the very beginning, religious themes in general—and the Ten Commandments in particular—have played a crucial role in our nation. Official references to the divine prevail from the Founding-era to today in an "unbroken history." *Lynch*, 465 U.S. at 674. Our history is replete with such references, and the Ten Commandments stands apart for its ubiquity. Because "the Establishment Clause must be interpreted by reference to historical practice and understanding[]," Act 573 passes

8

constitutional muster. *Kennedy*, 597 U.S. at 510 (internal quotation marks omitted).

## A. Evidence abounds of Founding-era emphasis on religious themes and traditions, and that emphasis persists today.

"There is an unbroken history of official acknowledgement by all three branches of government of the role of religion in American life from at least 1789." *Van Orden*, 545 U.S. at 686 (citing *Lynch*, 465 U.S. at 674). That history includes "official references to the value and invocation of Divine guidance" in proclamations and prayer before legislative sessions. *Lynch*, 465 U.S. at 675. Starting in the early colonial period, "a day of Thanksgiving was celebrated as a religious holiday to give thanks for the bounties of Nature as gifts from God." *Id.* at 675. The Second Continental Congress[2] and President George Washington continued that early tradition of proclaiming a day of thanksgiving "with all its religious overtones, [to be] a day of national celebration." *Id.* President Washington's famous and theologically robust 1789 Thanksgiving proclamation states the following:

---

[2] The Second Continental Congress's Nov. 1, 1777 Thanksgiving Proclamation from the Library of Congress can be found at https://www.loc.gov/resource/rbpe.04001400/?st=pdf.

9

> Whereas it is the duty of all Nations to acknowledge the providence of Almighty God, to obey his will, to be grateful for his benefits, and humbly to implore his protection and favor—and whereas both Houses of Congress have by their joint Committee requested me "to recommend to the People of the United States a day of public thanksgiving and prayer to be observed by acknowledging with grateful hearts the many signal favors of Almighty God especially by affording them an opportunity peaceably to establish a form of government for their safety and happiness."

> Now therefore I do recommend . . . the People of these States to the service of that great and glorious Being, who is the beneficent Author of all the good that was, that is, or that will be . . . and also that we may then unite in most humbly offering our prayers and supplications to the great Lord and Ruler of Nations and beseech him to pardon our national and other transgressions—to enable us all, whether in public or private stations, to perform our several and relative duties properly and punctually—to render our national government a blessing to all the people.

George Washington, U.S. President, Thanksgiving Proclamation (Oct. 3, 1789) (transcript available at https://founders.archives.gov/documents/Washington/05-04-02-0091). In the intervening centuries, "'forthrightly religious' Thanksgiving proclamations [have been] issued by nearly every President since Washington." *Town of Greece*, 572 U.S. at 580 (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 671 (1989)).

Appellate Case: 25-3311    Page: 18    Date Filed: 01/26/2026 Entry ID: 5600759

So too, our "unambiguous and unbroken history of more than 200 years" of opening legislative sessions with prayer reflects a longstanding tradition of non-coercive acknowledgment of the divine. *Town of Greece*, 572 U.S. at 576 (quoting *Marsh v. Chambers*, 463 U.S. 783, 792 (1983)). One of the first orders of business of the First Continental Congress was to appoint a chaplain to lead it in prayer. *See Marsh*, 463 U.S. at 787 (citing 1 J. of the Continental Cong. 26 (1774)). The First Congress continued the practice "and both the House and Senate have maintained the office," appointing official chaplains, "virtually uninterrupted since that time." *Town of Greece*, 572 U.S. at 575. In light of that historical pedigree, "there can be no doubt," the Supreme Court noted, "that the practice of opening legislative sessions with a prayer has become part of the fabric of our society." *Id.* at 576. The same goes for the judiciary, where proceedings traditionally begin "with an announcement that conclude[s], 'God save the United States and this Honorable Court.'" *Marsh*, 463 U.S. at 786.

### B. Other religious themes and traditions remain ubiquitous.

Even apart from Founding-era traditions, religious themes and traditions remain a ubiquitous feature of the public square. Emblems of

Appellate Case: 25-3311     Page: 19     Date Filed: 01/26/2026 Entry ID: 5600759

government authority such as flags, mottos, and seals routinely

incorporate plainly religious iconography and references.[3]   Federal law

---

[3] Alabama's and Florida's state flags feature a Cross of Saint Andrew, so named for Andrew the Apostle believed to have been crucified on an X-shaped cross. Ala. Code § 1-2-5 (2024); Fla. Dep't of State, State Flag, https://dos.fl.gov/florida-facts/florida-state-symbols/state-flag/ (last visited Dec. 23, 2025). Louisiana's state flag and seal features a pelican piercing her own breast to feed her young, which symbolizes the self-sacrifice of Jesus to early Christians. Rein Fertel, *Louisiana State Flag*, 64 Parishes (Mar. 23, 2024), https://64parishes.org/entry/louisiana-state-flag. Maryland's state flag includes crosses in two of its four quadrants. Md. Sec'y of State, Maryland Flag Protocol - Description and Care, https://sos.maryland.gov/pages/maryland-flag-protocol-description-and-care.aspx (last visited Dec. 23, 2025). Mississippi's state flag invokes God directly with the words "In God We Trust." Miss. Code Ann. § 3-3-16(1) (2025).   New Mexico's state flag use of a red "Zia" embraces Native American religious symbolism. N.M. Sec'y of State, About New Mexico, State Flag, https://www.sos.nm.gov/about-new-mexico/state-flag/ (last visited Dec. 23, 2025). Utah's state flag includes beehive, "one of the most common and enduring symbols of within Mormonism" representing "the kingdom of God." Val Brinkerhoff, *The Symbolism of the Beehive in Latter-day Saint Tradition*, https://byustudies.byu.edu/article/the-symbolism-of-the-beehive-in-latter-day-saint-tradition (last visited Dec. 23, 2025).

States have adopted mottos and seals that incorporate plainly religious references.  Arizona: "Ditat Deus" (meaning "God enriches"); Colorado: "Nil Sine Numine" (meaning "Nothing without providence or deity");   Connecticut: "Qui Transtulit Sustinet" (meaning "He who transplanted still sustains"); Florida: "In God We Trust"; Hawaii: "Ua mau ke ea o ka aina i ka pono" (meaning "The life of the land is perpetuated in righteousness"); Kentucky: "Deo gratiam habeamus" (meaning "Let us be grateful to God"); Ohio: "With God, All Things Are Possible"; and South Dakota: "Under God the People Rule." *See* Clare Mulroy, State mottos across America: Full list of the slogans for all 50

---

12

codifies "In God We Trust" as our national motto, 36 U.S.C. § 302, and mandates its feature on the Nation's currency, 31 U.S.C. §§ 5112(d)(1), 5114(b). Daily, Americans across the county, including schoolchildren in Arkansas classrooms, recite the Pledge of Allegiance to the American flag symbolizing "one Nation under God." 4 U.S.C. § 4. Our Nation's monuments[4] and memorials[5] feature overt religious symbols, and our museums[6] curate masterpieces with singular religious importance and meaning. And in the National Statuary Hall, religious leaders stand prominently in the seat of our nation's legislature.[7]

---

states and DC, USATODAY (Mar. 5, 2023), https://www.usatoday.com/story/news/2023/03/05/official-state-mottos-list-united-states/11068473002/.

[4] "The apex of the Washington Monument is inscribed with 'Laus Deo,'" which translates to "Praise be to God." *Van Orden*, 545 U.S. at 689 n.9.

[5] "[T]he Washington, Jefferson, and Lincoln Memorials all contain explicit invocations of God's importance." *Van Orden*, 545 U.S. at 689 n.9.

[6] "A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives." *Van Orden*, 545 U.S. at 689; *see Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 88 (2019) (Gorsuch, J., concurring).

[7] *American Legion v. American Humanist Ass'n*, 588 U.S. 29, 59 (2019) (listing examples of the "variety of religious figures" in the National Statuary Hall).

13

Of course, many of these religious references are far less significant to the American legal tradition and to the development of western civilization than are the Ten Commandments. *Van Orden*, <u>545 U.S. at 678</u> (the Ten Commandments has "an undeniable historical meaning"); *see also* H.R. Con. Res. 31, 105th Cong. (1998) (recognizing that "the Ten Commandments have had a significant impact on the development of the fundamental legal principles of Western Civilization"). Others reflect symbols or practices rooted in particular faith traditions and are less ecumenical than the Ten Commandments, which bear shared significance for Christians, Jews, and Muslims, alike. Yet they are proudly displayed in public squares across the Nation. If these divine references can stand, so too must Act 573.

## C. Representations of the Ten Commandments, in particular, are longstanding and ubiquitous.

Representations of the Ten Commandments have long played a role in American life, both in the public square broadly, and specifically in schools.

### 1. Ten Commandments in the Public Square

Displays that "acknowledge[] … the role played by the Ten Commandments in our Nation's heritage are common throughout

14

America." *Van Orden*, <u>545 U.S. at 688</u>.  Indeed, these acknowledgments appear prominently upon the Nation's most significant edifices—many, like the Ten Commandments, are etched in stone.  At the Supreme Court, for example, a seated Moses reveals the Ten Commandments atop the East Pediment in brilliant marble.[8]  *Van Orden*, <u>545 U.S. at 688</u>.  Inside, Moses has watched over the proceedings from the South Frieze since construction of the Supreme Court was completed in 1935.[9]  The Ten Commandments also "adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom." *Id.*  Visitors to the Capital also encounter Moses and the Ten Commandments in the Chamber of the United States House of Representatives, in the Rotunda of the Library of Congress' Jefferson Building, in the National Archives, and in the Department of Justice, to name just a few locations.  *Id.* at 689.  In fact, similar displays of

---

[8] *See* Office of the Curator, *The East Pediment*, Supreme Court of the United States, https://www.supremecourt.gov/about/EastPediment10-12-2021_Final.pdf (last updated Oct. 12, 2021).

[9] *See* Office of the Curator, *Courtroom Friezes: South and North Walls*, Supreme Court of the United States, https://www.supremecourt.gov/about/northandsouthwalls.pdf (last updated May 8, 2003).

Appellate Case: 25-3311     Page: 23     Date Filed: 01/26/2026 Entry ID: 5600759

comparable pedigree have been identified in almost every state of the Union. *See* Brief for the United States as Amicus Curiae, *Van Orden*, 2005 WL 263790, at *11, *1a–7a.

### 2. The Ten Commandments in Schools

Act 573 also fits comfortably within a long history of the use of the Ten Commandments in schools.  Indeed, "[e]ver since the mid-nineteenth century, they [Americans] saw to it that the Ten Commandments were just about everywhere: in houses of worship and private homes, on the street, *in school*, in the subway, and even on the interstate." Jenna Weismann Joselit, *Set in Stone: America's Embrace of the Ten Commandments* 2 (2017) (emphasis added).  "Whether taught at home or at school, the Ten Commandments were once a central feature of the moral education of American children. Students committed them to memory, declaimed them from the stage, and even put them to song." *Id.* at 64.

Three textbooks, in particular, that utilized the Ten Commandments were widely used in early American education: *The New England Primer*, *McGuffey's Readers*, and Noah Webster's *American Spelling Book*.  *McGuffey's Readers* were "omnipresent" during this time,

16

and "[p]erhaps the most consistent element in the nineteenth-century common school classroom." James W. Fraser, *Between Church and State* 35 (2d ed. 2016); *see* Letter from Chief Justice William H. Taft to Henry Ford re: McGuffey's Readers (Oct. 31, 1924) ("I attended the public schools … and began with the first of the McGuffey readers and continued clear through them to the sixth … they were instruments by which primary education could be thoroughly given.").[10]

The *Readers* were replete with references to the Ten Commandments. As just one example, *McGuffey's Fourth Eclectic Reader* contained the story of the "Young Witness," which described a nine-year-old girl who was called to testify at a criminal trial. *See McGuffey's Fourth Eclectic Reader* 207–210 (1920 rev. ed.).[11] An attempt to disqualify her because she "does not understand the nature of an oath" was made. The judge handed her an open Bible, asking "Do you know that book, my daughter?" She replied "Yes, sir; it is the Bible." The judge then asked "will you tell me what will befall you if you do not tell the truth?" The young girl replied: "I shall never go to heaven." When the

---

[10] Available at: https://www.thehenryford.org/collections-and-research/digital-collections/artifact/190328#slide=gs-245863.

[11] Available at: https://tinyurl.com/5n64bcsu.

Appellate Case: 25-3311     Page: 25     Date Filed: 01/26/2026 Entry ID: 5600759

judge asked how she knew this, "[t]he child took the Bible, turned rapidly to the chapter containing the commandments, and, pointing to the one which reads, 'Thou shalt not bear false witness against thy neighbor,' said, 'I learned that before I could read.'" She went on to recall how, on the way to the trial, her mother "kissed me, and told me to remember the Ninth Commandment." The judge, with "a tear glisten[ing] in his eye, and his lip quiv[ering] with emotion," said "God bless you, my child" and found her competent to testify. In the learning exercise following this story, the *Reader* asks "[w]hich commandment forbids us to bear false witness?"

*The New England Primer* was "the principal textbook for millions of colonists and early Americans," Encyclopedia Brittanica, *The New-England Primer*,[12] and "the most widely read schoolbook in America for 100 years." R. Freeman Butts & Lawrence A. Cremin, *A History of Education in American Culture* 69 (1953). Estimates state that between 1680 and 1830 more than 6.5 million copies of the *Primer* were printed. Charles Heartman, *The New England Primer Printed in America Prior*

_____

[12] Available at https://www.britannica.com/topic/The-New-England-Primer.

18

*to 1830: A Bibliographical Checklist* 11 (1915).  It too was filled with references to the Ten Commandments.  For example, the 1777 edition included the entire Westminster Shorter Catechism, which contains 40 questions concerning the Ten Commandments.  *See The New England Primer* (1777).[13]  Question 41 asks: "Where is the moral law summarily comprehended?"; to which the answer is "[t]he moral law is summarily comprehended in the ten commandments."  Thirty-nine more consecutive questions regarding the Ten Commandments follow Question 41.

Meanwhile, Noah Webster's *Speller* also included portions of the Ten Commandments.  For example, it stated that "Sunday is the Sabbath, or the day of rest, and called the Lord's day, being devoted to religious duties" and "Art thou a son or daughter? Be grateful to thy father, for he gave thee life, and to thy mother, for she sustained thee … Honor their grey hairs …"  Noah Webster, *The American Spelling Book* 82 (Cushing & Jewett, 1825).  These lessons correspond to the fifth and sixth commandments, respectively, in the version of the Ten Commandments set out in Act 573.

---

[13] Available at https://www.sacred-texts.com/chr/nep/1777/.

Appellate Case: 25-3311     Page: 27     Date Filed: 01/26/2026 Entry ID: 5600759

While it is true that education in the Founding era was largely not undertaken by government actors, multiple New England Colonies, like Massachusetts Bay, required that children be educated.  *See* Daniel L. Driesbach & Mark David Hall, *The Sacred Rights of Conscience* 94.  As discussed, the *Reader*, *Primer*, and *Speller* were prominent textbooks, and would doubtlessly have been used in this state-mandated education.  It is also clear that, although the federal government was not involved in founding-era forms of education, it was responsible for Native American education, in which it utilized Christian missionaries to teach Native American children.  *See* Nathan S. Chapman*, Forgotten Federal-Missionary Partnerships: New Light on the Establishment Clause*, 96 NOTRE DAME L. REV. 677, 701 (2020).  The Ten Commandments would have been read and taught by these Christian missionaries.

Even when public school became more universal, teachers would have taught the Ten Commandments.  Indeed, Horace Mann, the so-called father of the public school system, wrote that a nonsectarian public school "earnestly inculcates all Christian morals; it founds its morals on the basis of religion; it welcomes the religion of the Bible; and, in receiving the Bible, it allows it to do what it is allowed by no other

20

system— to speak for itself." Steven K. Green, *The Second Disestablishment: Church and State in Nineteenth-Century America* 262 (2010).

It is thus clear that the Ten Commandments were a prominent part of education during the Founding era, and that prominence continued well into the 20th century. Indeed, the Ten Commandments were used much more directly in education than the passive display mandated by Act 573. The display of the Ten Commandments in accordance with Act 573 thus fits comfortably within long "historical practices and understandings" and does not violate the Establishment Clause. *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576).

The unbroken presence of the Ten Commandments in American public life and its schools accounts for their "historical significance as one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53. But even "if the original purpose" of the Ten Commandments "was infused with religion, the passage of time may obscure that sentiment. . . . [and] a community may preserve [their display] for the sake of their historical significance or their place in a common cultural heritage." *Id.* at 54. Having done just that, Arkansas' decision to allow the posting of the Ten

Appellate Case: 25-3311    Page: 29    Date Filed: 01/26/2026 Entry ID: 5600759

Commandments in its classrooms is afforded "a strong presumption of constitutionality." *Id.* at 57.

## III. In Light of the Long History of Religious Displays, Including the Ten Commandments, Act 573 Does Not Violate the Establishment Clause.

The Supreme Court's regard for the Ten Commandments transcends architecture: "Our opinions, like our building, have recognized the role the Decalogue plays in America's heritage." *Van Orden*, 545 U.S. at 689. Focusing on "historical practice and understanding," as *Kennedy* instructs, the Act 573-mandated displays of the Ten Commandments do not violate the Establishment Clause. *Kennedy*, 597 U.S. at 535 (internal quotations omitted).

In *Van Orden*, the Supreme Court considered a 6-feet by 3.5-feet statue of the Ten Commandments on the Texas State Capitol grounds. *Van Orden*, 545 U.S. at 681. The statue did not have a statement and included Jewish and Christian symbols[14] highlighting the religious providence of the Ten Commandments. After reviewing the "rich American tradition of religious acknowledgements," the Supreme Court

---

[14] Below the text of the Ten Commandments were "two Stars of David" and the "Greek letters Chi and Rho" representing Christ. *Van Orden*, 545 U.S. at 681.

concluded that the Ten Commandments display did not violate the Establishment Clause. *Van Orden*, 545 U.S. at 690, 692; *accord ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 772, 778 (8th Cir. 2005) (granite monument in city park displaying the Ten Commandments did not violate the Establishment Clause).

Other non-coercive references to religious themes and traditions have also been sustained, further confirming that displays containing religious content do not violate the Establishment Clause. *American Legion* asked whether the Bladensburg Peace Cross, a World War I monument on public land in Bladensburg, Maryland violated the Establishment Clause. 588 U.S. at 36–38. The Bladensburg Peace Cross, as its name suggests, is a cross and a "preeminent Christian symbol." *Id*. Looking to "history for guidance," and recognizing the Bladensburg Peace Cross as part of a longstanding tradition of religious references, the Supreme Court rejected any Establishment Clause problem. *Id*. at 60, 63. Finally in *Lynch*, the Supreme Court held that the City of Pawtucket's annual Christmas-time display of a crèche did not violate the Establishment Clause in light of the "unbroken history of official

Appellate Case: 25-3311     Page: 31     Date Filed: 01/26/2026 Entry ID: 5600759

acknowledgement . . . of the role of religion in American life." 465 U.S. at 674.

Act 573 fits comfortably within this long line of cases upholding religious displays. Further, it does not implicate any of the "hallmarks of religious establishment the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 597 U.S. at 537. Arkansas is not "exert[ing] control over the doctrine [or] personnel of the established church"; it is not "mandat[ing] attendance" in a church or "punish[ing] people for failing to participate" in church attendance; is not "punish[ing] dissenting churches and individuals for their religious exercise"; "restric[ing] political participation by dissenters"; "provid[ing] financial support for the established church"; or "us[ing] the established church to carry out certain civil functions." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring).

Instead, Act 573 merely mandates the display of posters that include the Ten Commandments. This is a far cry from the hallmarks of religious establishment that the Establishment Clause seeks to prohibit. In light of the long history of religious displays and the use of the Ten Commandments in schools, and the lack of any of the hallmarks of

24

religious establishment, Act 573 does not violate the Establishment Clause. "Of course, some will take offense" even to the display of something as historically significant as the Ten Commandments, but "'[o]ffense ... does not equate to coercion.'" *Kennedy*, <u>597 U.S. at 538</u>–39 (quoting *Town of Greece*, <u>572 U.S. at 589</u>).

## <u>CONCLUSION</u>

For these reasons, the Court should reverse the lower court's injunction.

January 13, 2026

Respectfully submitted,

<u>/s/ *Jeremiah G. Dys*</u>

KELLY J. SHACKELFORD
JEFFERY C. MATEER
DAVID J. HACKER
JEREMIAH G. DYS*
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway
Suite 1600
Plano, TX 75075
Tel.: (972) 941-4444
jdys@firstliberty.org

*Counsel for Amici Curiae*
*Counsel of Record

25

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 29(a)(4)(g), I certify that:

This brief complies with Federal Rule of Appellate Procedure 27(d)(2) because it contains 4,808 words, as determined by the Microsoft Word for Mac version 16.102.2 word-processing system used to prepare the brief, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and type-style requirements of Rules 27(d)(1)(E) and 32(a)(5–6) because it has been prepared in a proportionately spaced typeface using the Microsoft Word for Mac version 16.102.2 in 14-point Century Schoolbook font.

/s/ *Jeremiah G. Dys*
Jeremiah G. Dys


## CIRCUIT RULE 28A(h) CERTIFICATION

I certify that the electronically filed version of this document has been scanned for viruses and has been determined to be virus-free.

/s/ *Jeremiah G. Dys*
Jeremiah G. Dys

26

## CERTIFICATE OF SERVICE

I certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on January 13, 2026. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ *Jeremiah G. Dys*
Jeremiah G. Dys